

**NUMBER 13-08-00527-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

TEXAS YOUTH COMMISSION -
EVINS REGIONAL JUVENILE CENTER,                          Appellant,

v.

NELINA GARZA,                                             Appellee.

---

**On appeal from the 93rd District Court of Hidalgo County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Vela
Memorandum Opinion by Justice Garza**

Appellant, Texas Youth Commission-Evins Regional Juvenile Center ("TYC"), appeals the trial court's denial of its plea to the jurisdiction in favor of appellee, Nelina Garza. By two issues, the TYC contends that the trial court committed reversible error because: (1) Garza failed to exhaust her administrative remedies under the Texas Whistleblower Act, *see* TEX. GOV'T CODE ANN. §§ 554.001-.010 (Vernon 2004); and (2)

Garza's claims under chapter 261 of the family code could have been brought under the Texas Whistleblower Act and are, thus, precluded. *See* TEX. FAM. CODE ANN. § 261.110(b), (*l*) (Vernon 2008). We affirm.

## I. BACKGROUND

This dispute pertains to numerous grievances filed by Garza against TYC for employment retaliation that allegedly resulted because she reported child abuse at TYC during a riot that occurred at the Evins Regional Juvenile Center (the "Evins facility") in late October and early November 2004.

### A. The Riot at the Evins Facility

In late October 2004, TYC officials learned that a group of youthful offenders intended to riot at the Evins facility to protest the removal of privileges as punishment for misbehavior. In response to the threat, TYC officials brought in juvenile correctional officers from other facilities around the state. These officers, also known as the STAR team, were trained in quelling riots and dealing with disruptive situations.

On the night of October 31, 2004, a group of youthful offenders set fire to their dormitory and incited a riot on one of the facility's dormitory floors. Members of the STAR team moved to quell the riot. The actions of the STAR team in quelling the riot served as the basis for Garza's reports of child abuse.

In various administrative complaints, Garza alleged that she personally witnessed the actions of several members of the STAR team during the riot. Garza asserted that she observed several STAR team members physically abuse the youthful offenders, including throwing them to the ground, striking them in the face and body, throwing them against the wall, hand-cuffing them and placing them in fire ant piles for hours at a time, and cursing

2

at them.[1]

Thereafter, Garza reported these alleged abuses to both Superintendent Bill Roach and Assistant Superintendent Jean Tomlinson. Garza later contended that neither Roach nor Tomlinson did anything in response to her reports. Garza subsequently made an anonymous report to the Child Protective Services child abuse hotline and filed a report with the Edinburg Police Department. Garza also participated in an on-camera interview with the local Edinburg media, describing the alleged abuses that she had witnessed.

## B. Garza's Complaints About Employment Retaliation

Garza contended that shortly after reporting the alleged instances of child abuse she: (1) was subjected to a retaliatory hostile work environment; (2) received unwarranted written reprimands; (3) was denied three promotions; (4) was subjected to a workload increase; (5) was verbally counseled in March 2005; (6) was overly scrutinized in carrying out her job responsibilities; (7) received low performance evaluations; and (8) was constructively terminated. Garza stated that she was subjected to this treatment by TYC officials because of the child abuse reports she made.

---

[1] In her deposition, Garza made the following statements with respect to the actions of the STAR team:

> I witnessed they were hog-tying the youth. They were putting them on top of ant piles. They were leaving them out there up to four hours. I had timed it, so I know how long it was. They were basically just verbal abuse [sic] towards them, cursing them. They were also banging them against the walls.
>
> . . . .
>
> They [the youthful offenders] had their hands behind their back and then their feet, and they were tied up together.
>
> . . . .
>
> And they were lying on their stomach.

3

The record contains three grievances filed by Garza with TYC officials. The first grievance, received by TYC officials on November 23, 2004, contained the following three complaints: (1) "On 11-16-04, Mr. Roach is questioning my integrity and work ethics"[2]; (2) "On 11-18-04, Ms. Tomlinson is questioning (doubting) my ability to perform my job duties on completing the level 1 hearings for the youth that were involved in the riot on 10-30-04"[3]; and (3) "On 11-18-04, Mr. Roach was obstructing my ability to protect the [S]tate's interest in prosecuting the riot cases."[4] In a letter dated January 3, 2005, Britt Canary, Director of

---

[2] With respect to her first complaint, Garza stated the following:

I have a youth on my caseload that his mother needed money to help pay the rent for this month. So, on 11-16-04, I went into Mr. Roach's office to get his signature on a money request for the youth. Mr. Roach asked me if I checked on why this youth wanted to send money home because parents have been know[n] to steal from the youth. I informed him that I had spoken to the mother. Then he makes a [sic] the comment, "I will only sign this for a trustworthy person." Mr. Roach had a grin on his face. I respond by saying, "yes sir, that is why I checked with his mother and the parole officer which had to go and complete a new home evaluation because the family had to be re-located to a new neighborhood so the parole officer will approve the home. The youth would not be able to go home other wise [sic]. His mother was ill and not able to work for a few weeks and she does not have sick leave." He signs the request then states, "so you went to approve the home." I stated, "no, that is the [parole officer's] job."

Mr. Canary was sitting there with a smile on his face. I don't know if they both were mocking me or just trying to belittle me. Well, I felt like Mr. Roach is questioning my integrity and work ethics. I have been working for TYC 7 years and 10 ½ months. My record should speak for itself. I have always been courtesy [sic] to everyone and have show [sic] professionalism even after I have been disrespect [sic] and degraded. . . .

[3] Garza's second complaint pertained to Tomlinson's reluctance to turn over a video tape of the riot to two attorneys representing youths involved. Garza alleged that "Ms. Tomlinson made me feel like I don't know what I'm doing[,] and she has to be on top of me. When in fact she does not know anything about conducting a level 1 hearing."

[4] In her third complaint, Garza noted that:

I went to administration to find Ms. Tomlinson and inform her that Mr. Moton [counsel for a youth involved in the riot] wishes to view the tape. . . . Mr. Roach was viewing the tape with David Guerra, Belinda Lanfranco[,] and I believe the other person was Britt Canary . . . . Mr. Roach was very rude and disrespectful to me. He spoke to me in a very demanding rude voice and looked at me with hate in his eyes. He scared me; I have never seen Mr. Roach look at me like that or speak to me in that tone of voice. Mr. Roach stated[,] "I have not viewed the tape until now. When and if I'm going to allow the attorney to view it, I will speak to the attorney." I looked at him with an okay look. Then he states, "I'm at no one[']s beck and call" staring me down. . . . Mr. Roach made me feel like I was doing something wrong by allowing the attorney and his clients (youth) to view the tape. I did not appreciate the tone

4

Juvenile Corrections with the TYC, notified Garza that he had concluded that Roach and Tomlinson "did not intentionally question your ethics or integrity." Canary based his conclusion on conversations he had with Roach, Tomlinson, Chester Clay, the Deputy Director of Juvenile Corrections, and Amy Cooper, the hearing officer. Canary noted that "[t]his decision exhausts your administrative remedies."

The second grievance, filed on February 8, 2005, involved a written reprimand that Garza received for failing to follow proper procedures in filling out agency forms and incident reports. Garza sought to have the written reprimand expunged from her personnel file and argued that TYC was not consistent in issuing written reprimands. Tomlinson conducted the investigation of Garza's second grievance, and, after speaking with Juan Gonzalez and Belinda Lanfranco, Data Coordinator, concluded that Garza did not violate TYC procedures and that Garza was entitled to the relief sought. In a letter dated April 18, 2005, Tomlinson notified Garza that the written reprimand was to be rescinded.

The third grievance, signed by Garza on March 21, 2005, alleged that: "Mr. Bart Caldwell [the current superintendent of the Evins Regional Juvenile Center] and Jean Tomlinson are harssing [sic] me and creating a hostile work environment for me at work." The grievance also noted that "On 3-7-05, at about 5:30 p.m., I was threaten [sic] with termination and the chain of command was used. Ms. Tomlinson released J.Z. . . . from security because I was the victim of the sexual contact" and that "[m]ost of the caseworkers know how I'm begin [sic] treated."[5] With respect to the relief sought, Garza stated that she

of voice and the mannerism that he spoke to me. How Mr. Roach disrespected, belittled[,] and degraded me in front of my co-workers, an outside attorney, and parents.

[5] In this complaint, Garza referred to TYC's decision to release a youthful offender back to his dorm from security after Garza had alleged that the offender had inappropriately touched her buttocks. Garza believed that TYC officials were retaliating against her by choosing to release the offender back into the general population.

5

wanted TYC officials to stop retaliating against her. Canary investigated Garza's third grievance and, after speaking with Caldwell, Tomlinson, and Jimmy Reyes, Recreation Program Specialist, Canary denied Garza's request for relief in a letter dated April 11, 2005. In his April 11, 2005 letter, Canary noted that Garza had not presented any evidence to suggest that she was retaliated against and that his decision was "final, and not subject to appeal."

In early 2005, Garza applied for the positions of program administrator and assistant superintendent at the Beto House, a TYC facility located in McAllen, Texas. In her deposition, Garza noted that a TYC official told her that she was being groomed for each of these positions. However, TYC officials ultimately hired other people for the positions. Garza alleged that she was denied these promotions because of the child abuse report she had made earlier. Garza also alleged in her deposition testimony that TYC officials retaliated against her by terminating her when she was unable to resume her regular duties as a caseworker due to injuries sustained at the Evins facility.[6]

## C. Procedural History

On May 10, 2005, Garza filed her original petition in this matter, asserting a cause of action under chapter 554 of the government code for harassment and a hostile work environment created by TYC officials. *See* TEX. GOV'T CODE ANN. §§ 554.001-.010. TYC filed its original answer and affirmative defenses on May 31, 2005. In this filing, TYC alleged, among other things, that Garza failed to: (1) comply with the applicable statute of limitations requiring her to file her lawsuit within ninety days after the occurrence of any alleged adverse personnel action, *see id.* § 554.005; (2) exhaust her administrative

---

[6] Garza stated in her deposition that she injured her back in August 2005, when she slipped and fell on the floor at the Evins facility. She further stated that TYC terminated her in January 2006.

6

remedies as required by chapter 554, *see id.* § 554.006(a), (d); or (3) make any report, in good faith, to an appropriate law enforcement authority.

On August 31, 2007, Garza filed her first amended petition. In this filing, Garza re-asserted the claims made in her original petition, and she included a new cause of action for discrimination under section 261.110 of the family code. *See* TEX. FAM. CODE ANN. § 261.110. In addition, Garza noted the following in her first amended petition:

> Because of such reporting made in good faith, Plaintiff suffered adverse personnel actions at the Evins Regional Juvenile Center. Specifically, Plaintiff was passed up for promotions, such as Program Administrator and Assistant Superintendent at the facility known as the Beto House.

> Further, Plaintiff's complaints and grievances were generally not considered or resolved in a timely manner as other complaints and grievances because of her reporting violations of law back in November of 2004. Plaintiff's work assignment was also affected by the discrimination she suffered at work. Plaintiff's job performance and evaluation have also been questioned and subject to undue scrutiny resulting in harassment.

> . . . .

> As a result of such adverse personnel actions, Plaintiff has suffered harassment and mental anguish.

TYC subsequently filed its second amended plea to the jurisdiction on March 25, 2008. In its plea to the jurisdiction, TYC argued that the trial court lacked jurisdiction to hear Garza's claims because Garza failed to comply with the grievance procedures outlined by section 554.006 of the government code. *See* TEX. GOV'T CODE ANN. § 554.006(a), (d). TYC further alleged that Garza's prior grievances were insufficient to establish a "hostile work environment" claim. TYC also argued that Garza was precluded from bringing a claim under chapter 261 of the family code because the substance of Garza's claims—the "alleged retaliation for reporting child abuse (a criminal act)"—invoked

7

both chapter 261 of the family code and chapter 554 of the government code, and the family code specifically provides that "[a] public employee who has a cause of action under Chapter 554, Government Code, . . . may not bring an action based on that conduct under this section." TEX. FAM. CODE ANN. § 261.110(*l*); *see* TEX. GOV'T CODE ANN. § 554.002.

After a hearing on May 28, 2008, the trial court requested a transcript of Garza's deposition that was taken on August 28, 2007, which TYC provided. The trial court subsequently denied TYC's plea to the jurisdiction on August 18, 2008. In its order denying TYC's plea to the jurisdiction, the trial court noted the following: "IT IS ORDERED that Plaintiff [Garza] is precluded from submitting any jury issues under Chapter 261 of the Texas Family Code on any causes of action that could sustain an action under Chapter 554 of the Texas Government Code known as the Texas Whistleblower's [sic] Act . . . ." This interlocutory appeal followed.

## II. STANDARD OF REVIEW

We have jurisdiction to review a district court's interlocutory order that grants or denies a plea to the jurisdiction by a governmental unit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (Vernon 2008), § 101.001(3)(B) (Vernon 2005). A plea to the jurisdiction is a dilatory plea used to defeat a cause of action without regard to whether the claims asserted have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The plea challenges the trial court's subject-matter jurisdiction. *Id.*; see *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). Whether a trial court has subject-matter jurisdiction and whether a pleader has alleged facts that affirmatively demonstrate the trial court's subject-matter jurisdiction are questions of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Tex. Natural*

8

*Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

The plaintiff has the burden to plead facts affirmatively showing that the trial court has jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *Univ. of N. Tex. v. Harvey*, 124 S.W.3d 216, 220 (Tex. App.–Fort Worth 2003, pet. denied). We construe the pleadings liberally in favor of the pleader, look to the pleader's intent, and accept as true the factual allegations in the pleadings. *See Miranda*, 133 S.W.3d at 226, 228; *City of Fort Worth v. Crockett*, 142 S.W.3d 550, 552 (Tex. App.–Fort Worth 2004, pet. denied). If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *Miranda*, 133 S.W.3d at 227; *Blue*, 34 S.W.3d at 555 (confining evidentiary review to evidence that is relevant to the jurisdictional issue).

A trial court's review of a plea to the jurisdiction challenging the existence of jurisdictional facts mirrors that of a traditional motion for summary judgment. *Miranda*, 133 S.W.3d at 228; *see* TEX. R. CIV. P. 166a(c). The governmental unit is required to meet the summary judgment standard of proof for its assertion that the trial court lacks jurisdiction. *Miranda*, 133 S.W.3d at 228. The plaintiff is then required to show that there is a disputed material fact regarding the jurisdictional issue. *Id.* If the evidence creates a fact question regarding jurisdiction, the trial court must deny the plea to the jurisdiction and leave its resolution to the fact finder. *Id.* at 227-28. But, if the evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

9

## A. Garza's Whistleblower Claims

In its first issue, TYC argues that the trial court committed reversible error by refusing to grant its plea to the jurisdiction because Garza "failed to exhaust her administrative remedies with respect to the promotion denials, termination, and 'hostile work environment.'" Garza contends that she initiated and exhausted her administrative remedies with respect to her "hostile work environment" and retaliation claims. She also contends that (1) she was not required to draft her complaints with the same exacting standard applied to pleadings drafted by attorneys, and (2) TYC officials had notice of all of her claims because they were the ones "who were the final arbiters of her grievances."

### 1. Initiation of an Action Under the Texas Whistleblower Act

The Texas Whistleblower Act (the "Act") prevents state or local governmental entities from suspending, terminating, or taking an adverse personnel action[7] against a public employee who in good faith reports a violation of law by the state governmental entity to an appropriate law enforcement authority.[8] TEX. GOV'T CODE ANN. § 554.002(a). The Act contains an express waiver of the State's sovereign immunity. *See id.* § 554.0035 ("A public employee who alleges a violation of this chapter may sue the employing state

---

[7] A "[p]ersonnel action" is defined in the Whistleblower Act as "an action that affects a public employee's compensation, promotion, transfer, work assignment, or performance evaluation." TEX. GOV'T CODE ANN. § 554.001(3) (Vernon 2004). The United States Supreme Court has held that in establishing an adverse personnel action, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse . . . ." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted); *see Montgomery County v. Park*, 246 S.W.3d 610, 612 (Tex. 2007) ("[F]or a personnel action to be adverse within the meaning of the [Texas Whistleblower] Act, it must be material, and thus likely to deter a reasonable, similarly situated employee from reporting a violation of the law.").

[8] The Whistleblower Act provides that a "[s]tate governmental entity" is "a board, commission, department, office, or other agency in the executive branch of state government, created under the constitution or a statute of the state . . . ." TEX. GOV'T CODE ANN. § 554.001(5)(A).

or local governmental entity for the relief provided by this chapter. Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter."); *see also Tex. Dep't of Human Servs. v. Okoli*, 263 S.W.3d 275, 278 (Tex. App.–Houston [1st Dist.] 2007, pet. filed) (noting that the first sentence of section 554.0035 of the government code waives immunity from suit and the second sentence waives immunity from liability).

Before filing suit, however, a claimant "*must initiate action* under the grievance or appeal procedures of the employing state or local governmental entity relating to suspension or termination of employment or adverse personnel action." TEX. GOV'T CODE ANN. § 554.006(a) (emphasis added); *see Univ. of Tex. Med. Branch at Galveston v. Barrett*, 159 S.W.3d 631, 632 (Tex. 2005) ("Before suing under the Texas Whistleblower Act, a public employee must timely initiate his employer's grievance or appeal procedures relating to employee discipline."); *Univ. of Tex. Med. Branch at Galveston v. Savoy*, 86 S.W.3d 782, 785 (Tex. App.–Beaumont 2002, pet. denied). If a final decision is not rendered within sixty days after the date grievance procedures are initiated, then the employee may elect to exhaust the applicable grievance procedures previously initiated or terminate the grievance procedures altogether and timely file suit. *See* TEX. GOV'T CODE ANN. § 554.006(d)(1), (2).

The requirement that an employee "initiate" grievance procedures before filing suit is to afford the employer an opportunity to correct its errors by resolving disputes before litigation. *City of San Antonio v. Marin*, 19 S.W.3d 438, 441 (Tex. App.–San Antonio 2000), *disapproved of on other grounds by Barrett*, 159 S.W.3d at 633 n.7. Section 554.006 does not require that grievance or appeal procedures be exhausted before suit

can be filed; rather, it requires that such procedures be timely initiated and that the grievance or appeal authority have sixty days to render a final decision. *Barrett*, 159 S.W.3d at 632; *see City of Fort Worth v. Shilling*, 266 S.W.3d 97, 102 (Tex. App.–Fort Worth 2008, pet. filed). While the Whistleblower Act does not dictate what actions are required to "initiate" the grievance procedure, the Act is remedial in nature and should be liberally construed to effect its purpose. *Moore v. Univ. of Houston-Clear Lake*, 165 S.W.3d 97, 102 (Tex. App.–Houston [14th Dist.] 2005, no pet.); *City of New Braunfels v. Allen*, 132 S.W.3d 157, 161 (Tex. App.–Austin 2004, no pet.).

### 2. Discussion

TYC argues that Garza failed to exhaust her administrative remedies with respect to her complaints for promotion denials, termination, and "hostile work environment." TYC also argues that because Garza did not specifically grieve each of her complaints, she did not provide TYC with adequate notice of her complaints in a timely manner; therefore, Garza did not meet the statutory prerequisites to filing suit, which thereby deprived the trial court of subject-matter jurisdiction over her complaints. *See* TEX. GOV'T CODE ANN. § 311.034 (Vernon Supp. 2008).[9]

---

[9] At the time Garza's lawsuit was filed, the previous version of section 311.034 of the government code was in effect. *See* Act of June 15, 2001, 77th Leg., R.S., ch. 1158, § 8, 2001 Tex. Gen. Laws 2431, 2433 (amended 2005) (current version at TEX. GOV'T CODE ANN. § 311.034 (Vernon Supp. 2008)). The previous version of section 311.034 provided the following:

> In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language. In a statute, the use of "person," as defined by Section 311.005 to include governmental entities, does not indicate legislative intent to waive sovereign immunity unless the context of the statute indicates no other reasonable construction.

*Id.* However, in 2005, the legislature amended section 311.034 to include the following language: "Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity." Act of June 18, 2005, 79th Leg., R.S., ch. 1150, § 1, 2005 Tex. Gen. Laws 3785, 3785. The 2005 amendment to section 311.034 became effective on September 1, 2005. In the instant case, Garza

Both parties confine their analysis to Garza's March 21, 2005 grievance because it was the only grievance filed within ninety days of Garza's lawsuit. *See* TEX. GOV'T CODE ANN. § 554.005 (Vernon 2004) (requiring that the employee file suit no later than the 90th day after the date on which the alleged violation "(1) occurred; or (2) was discovered by the employee through reasonable diligence"). However, we find that Garza's February 8, 2005 complaint is also within the purview of this appeal because TYC did not issue its findings as to that complaint until April 18, 2005, and Garza filed her lawsuit on May 10, 2005. *See id.* § 554.006(c) ("Time used by the employee in acting under the grievance or appeal procedures is excluded, except as provided by Subsection (d), from the period established by Section 554.005."), (d) ("*If a final decision is not rendered before the 61st day after the date procedures are initiated . . ., the employee may elect to . . . exhaust the applicable procedures under Subsection (a)*, in which event the employee must sue not later than the 30th day after the date those procedures are exhausted to obtain relief under this chapter . . . .") (emphasis added).

In reviewing Garza's grievances, we are mindful of the supreme court's practice of construing "the pleadings liberally in the plaintiff's favor." *See Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002). "Good faith allegations are to be taken as true, unless the defendant pleads and proves that the petition's allegations were fraudulently made to confer jurisdiction." *City of Austin v. Ender*, 30 S.W.3d 590, 593 (Tex. App.–Austin 2000, no pet.). Moreover, section 554.006 does not require an employee to use particular words when initiating a grievance, which is consistent with a liberal

filed her lawsuit on May 10, 2005. Thus, the 2005 amendment to section 311.034 was not in effect at the time Garza filed her lawsuit and, therefore, is not applicable, contrary to TYC's assertions.

construction of the Act. *See* TEX. GOV'T CODE ANN. § 554.006; *see also Moore*, 165 S.W.3d at 102; *Allen*, 132 S.W.3d at 161.

Contrary to TYC's assertions, section 554.006 does not require that the grievance or appeal procedures be exhausted before a lawsuit may be filed; rather, section 554.006 only requires that such procedures be timely initiated and that the employer be given sixty days in which to respond to the grievance. *See* TEX. GOV'T CODE ANN. § 554.006; *Barrett*, 159 S.W.3d at 632; *Shilling*, 266 S.W.3d at 102. Therefore, the relevant inquiry is whether Garza initiated her complaints through TYC's grievance process.

In her February 8, 2005 grievance, Garza complained about a written reprimand that she had received. Garza alleged in her complaint that the reprimand was unwarranted and sought to have it expunged from her personnel file. Garza further alleged that TYC officials were not acting in a consistent manner in issuing written reprimands. After conducting an investigation, TYC officials determined that Garza had not violated TYC procedures and that she was entitled to have the reprimand expunged from her record. Tomlinson provided Garza with a copy of her findings on April 18, 2005.

In her March 21, 2005 grievance, Garza complained about TYC's early release of a youthful offender back into the general population even though the youthful offender had allegedly touched Garza inappropriately. In addition, Garza took issue with a meeting conducted on March 7, 2005, at which TYC officials allegedly threatened her with termination. Specifically, Garza stated the following in her March 21, 2005 grievance: (1) "Mr. Bart Caldwell and Jean Tomlinson are harssing [sic] me and creating a hostile work environment for me at work"; (2) she was threatened with termination; (3) TYC officials were retaliating against her; and (4) most of the caseworkers at the Evins facility were

14

aware of how TYC officials were treating her.

Garza provided deposition testimony that she applied for the positions of program administrator and an assistant superintendent position at the Beto House in January 2005. Garza alleged that a TYC official told her that she was being groomed for both of the positions. However, TYC officials hired other people for the positions, which Garza alleged was in retaliation for her making the child abuse report. Garza recalled that Canary informed her that he did not approve of her making the child abuse report. Garza testified that TYC officials were nice, accommodating, and cordial to her prior to the child abuse report; however, TYC officials became increasingly hostile towards her after the report was made. In fact, Garza alleged that, after she made the child abuse report, TYC officials: (1) were rude to her; (2) refused to help her; (3) repeatedly questioned her ability to do her job even though she had worked for TYC for more than seven years; (4) prevented her from doing her job; (5) issued her unwarranted reprimands; and (6) rated her less favorably on her performance evaluations. When asked about her "hostile work environment" complaint, Garza stated that:

> Everything just happened at once. How could I say? They just stopped talking to me. My supervisor wouldn't even look at me. They just—everybody was—it just became, like, very hostile.
>
> . . . .
>
> Yes. They would—like the security staff would refuse to help me whenever we had to bring out some of the youth outside. There's a procedure that had to be followed. They would not assist me at all.
>
> . . . .
>
> Just the way they were treating me. They were always taking me into their office. Basically[,] they would threaten to fire me, on several occasions. They were yelling at me. Ms. Tomlinson would—had cursed at me before, saying that what I was doing was incorrect, that I did not know what I was

15

doing, and this was going on, like, on a daily basis.

Garza later stated that she worked with TYC until January 2006, when she was medically separated. Garza had previously injured her back when she slipped and fell on the floor at the Evins facility in August 2005. Prior to her separation, Garza had not worked for TYC for three months while she was recovering from her injuries. Once her doctor cleared her for light duty, Garza returned to work. Upon her return, TYC officials placed her on regular duty, which included lifting up to 100 pounds, climbing stairs, and restraining unruly youthful offenders. Garza testified that light duty encompassed typical administrative tasks like answering the telephone and filing. Garza tried to perform the tasks of a TYC employee on regular duty, but doing so aggravated her injuries. Because she was unable to perform her regular duties, TYC sent Garza a letter notifying her of her medical separation in January 2006. Garza alleged that the events surrounding her medical separation from TYC was yet another instance of retaliation by TYC officials.

Later, counsel for TYC questioned Garza as to why she did not specifically grieve each instance of retaliation allegedly engaged in by TYC officials. Garza responded by alleging that she did not believe that she had anyone to which to grieve. Garza also was unable to recall whether she filed a grievance pertaining to the denials of the two job promotions. In reviewing Garza's deposition testimony, we are unable to discern any commentary on the third job promotion which Garza references on appeal.

Garza's February 8, 2005 and March 21, 2005 grievances neither contain the detail that TYC suggests is required nor the detail Garza provided in her deposition testimony. However, we cannot conclude that TYC established as a matter of law that Garza failed to initiate a grievance because the record contains a copy of Canary's April 11, 2005 letter

16

and Tomlinson's April 18, 2005 letter in response to Garza's grievance. These letters acknowledged TYC's investigation and conclusion that TYC officials had not retaliated against Garza and that Garza had received an unwarranted reprimand. *See Shilling*, 266 S.W.3d at 103 (concluding that because the City conducted an investigation of an employee's grievance, the employee had created a fact issue as to whether the City's grievance procedures were initiated). In fact, TYC's notice argument is belied by the fact that it commenced investigations into Garza's February 8, 2005 and March 21, 2005 grievances. *See id.*; *see also Montgomery County Hosp. Dist. v. Smith*, 181 S.W.3d 844, 850 (Tex. App.–Beaumont 2005, no pet.) (holding that in the absence of a statutory standard or a standard created by an employer's grievance procedures, an employer is entitled to fair notice of its employment decisions that are being grieved).[10] There is no evidence—nor is it argued—that TYC initiated the investigations into Garza's complaints on its own or for any other reason than Garza's filing of a grievance.

Moreover, the record contains jurisdictional facts that support Garza's allegations that: (1) the actions of TYC officials towards Garza were adverse personnel actions; (2) that TYC officials continuously engaged in retaliatory acts against Garza in response to her reporting of the alleged instances of child abuse; and (3) such actions may have created a "hostile work environment."[11] *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

---

[10] In *Montgomery County Hospital District v. Smith*, the Beaumont Court of Appeals also declined to create a futility exception to the Whistleblower Act, which would have allowed an employee to avoid the grievance process where the person reviewing her termination was "the person who made the decision to fire her and whom she accused of committing a crime." 181 S.W.3d 844, 853-54 (Tex. App.–Beaumont 2005, no pet.).

[11] To rise to an actionable level, a hostile environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *see Garcia v. Levi Strauss & Co.*, 85 S.W.3d 362, 369 (Tex. App.–El Paso 2002, no pet.). The United States Supreme Court has made is clear "that conduct must be extreme to amount to a change in the terms and conditions of employment .

17

53, 68 (2006) (recognizing that a retaliation action is an action that "a reasonable employee would have found . . . [to be] materially adverse"); *see also Montgomery County v. Park*, 246 S.W.3d 610, 612 (Tex. 2007) ("[F]or a personnel action to be adverse within the meaning of the [Texas Whistleblower] Act, it must be material, and thus likely to deter a reasonable, similarly situated employee from reporting a violation of the law."). Under the Act, public employees are protected from retaliation for reporting, in good faith, violations of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.[12] *See* TEX. GOV'T CODE ANN. § 554.002(a); *see also Alejandro v. Robstown Indep. Sch. Dist.*, 131 S.W.3d 663, 667 (Tex. App.–Corpus Christi 2004, no pet.). With the exception of the third promotion denial which Garza did not provide any evidence to support, the record contains jurisdictional facts that: (1) Garza's complaints all flowed from the retaliation and "hostile work environment" language Garza provided in her March 21, 2005 grievance; and (2) Garza's February 8, 2005 grievance pertaining to an unwarranted reprimand constituted another instance of potential retaliation by TYC officials. *See, e.g., Watson v. Dallas Indep. Sch. Dist.*, 135 S.W.3d 208, 226 (Tex. App.–Waco 2004, no pet.) (concluding that the employee's complaints about retaliatory employment actions that occurred after the original grievance was filed flowed from the original grievance filed regarding retaliation).

---

. . ." *Faragher*, 524 U.S. at 788. "'[S]imple teasing,' offhand comments, and isolated incidents unless extremely serious will not amount to discriminatory changes in the "'terms and conditions of employment.'" *Id.* at 788; *see also Cerre v. Odfjell Terminals (Houston), LP*, No. 13-05-055-CV, 2006 Tex. App. LEXIS 4083, at **11-12 (Tex. App.–Corpus Christi May 11, 2006, no pet.) (mem. op.). "A hostile work environment is one 'so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace.'" *Cerre*, 2006 Tex. App. LEXIS 4083, at *12 (quoting *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).

[12] On appeal, TYC does not argue that Garza reported the alleged instances of child abuse in bad faith, nor does it argue that Garza failed to report the alleged instances of child abuse to an appropriate law enforcement authority. *See* TEX. GOV'T CODE ANN. § 554.002(a) (Vernon 2004).

We disagree with TYC's argument that Garza was required to grieve each specific instance of retaliation. First, TYC has not provided a copy of its grievance procedures requiring Garza to do so. *See id.* (noting that the grievance procedures for the Dallas Independent School District precluded employees from bringing separate or serial grievances arising from any event or a series of events that could have been previously grieved). Second, an employee's handwritten Whistleblower complaints are not to be held to the same exacting standard as applied to pleadings drafted by attorneys. *See Ender*, 30 S.W.3d at 595. Third, this Court has applied the continuing-violation doctrine to Whistleblower claims. *See Univ. of Tex.-Pan Am. v. De Los Santos*, 997 S.W.2d 817, 820 (Tex. App.–Corpus Christi 1999, no pet.) ("Under the 'continuing violation' doctrine, equitable considerations may require that the limitations period not begin to run at the date of the first incident of retaliatory conduct, but rather be tolled until facts supportive of a cause of action are or should be apparent to a reasonably prudent person similarly situated.") (internal footnote omitted); *see also Univ. of Houston v. Barth*, 178 S.W.3d 157, 163 (Tex. App.–Houston [1st Dist.] 2005, pet. denied). There are sufficient factual allegations in Garza's pleadings and in her grievances to support her contentions that she was subjected to ongoing retaliation by TYC officials which ultimately created a "hostile work environment" and could invoke the continuing-violation doctrine; however, whether that doctrine applies and which acts triggered the limitations period are issues that should be resolved by the trier of fact. *See Barth*, 178 S.W.3d at 163.

In any event, Garza's jurisdictional evidence has created a fact issue regarding whether each of her complaints were initiated by her February 8, 2005 and March 21, 2005 grievances. *See* TEX. GOV'T CODE ANN. § 554.006(a). TYC's arguments on appeal do not

19

establish its plea to the jurisdiction as a matter of law; instead, its arguments highlight a fact dispute as to whether Garza's complaints were indeed "initiated" under TYC's grievance procedures. *See City of Dallas v. Watts*, 248 S.W.3d 918, 921-22 (Tex. App.–Dallas 2008, no pet.) (reasoning that appellant's arguments do not establish its plea to the jurisdiction as a matter of law but highlight a fact dispute as to whether appellee's actions "initiated" appellant's appeal procedures). Consequently, the trial court did not err in denying TYC's plea to the jurisdiction on this ground. *See Miranda*, 133 S.W.3d at 227-28 (reasoning that the trial court must deny the plea to the jurisdiction and leave its resolution to the fact finder if the evidence creates a fact question regarding jurisdiction); *Watts*, 248 S.W.3d at 921-22. We overrule TYC's first issue.

## B. Garza's Texas Family Code Claims

In its second issue, TYC asserts that the trial court committed reversible error by failing to grant its plea to the jurisdiction with respect to all of Garza's claims under chapter 261 of the family code. TYC argues that all of Garza's claims could have been brought under the Act; therefore, Garza's family code claims were precluded. Garza counters by arguing that she pleaded facts that supported a chapter 261 claim that did not fall under the Act.

### 1. Employment Retaliation Under the Texas Family Code

Section 261.110 of the family code provides that an employer:

may not suspend or terminate the employment of, or otherwise discriminate against, a person who is a professional and who in good faith:

(1) reports child abuse or neglect to:

(A) the person's supervisor;

(B) an administrator of the facility where the person is

20

employed;

(C) a state regulatory agency;

(D) a law enforcement agency; or

(2) initiates or cooperates with an investigation or proceeding by a governmental agency relating to an allegation of child abuse or neglect.

TEX. FAM. CODE ANN. § 261.110(b) (Vernon 2008). Moreover, subsection (f) provides that:

A public employee who alleges a violation of this section may sue the employing state or local governmental entity for the relief provided for by this section. Sovereign immunity is waived and abolished to the extent of liability created by this section. A person having a claim under this section may sue a governmental unit for damages allowed by this section.

*Id.* § 261.110(f). However, "[a] public employee who has a cause of action under Chapter 554, Government Code, based on conduct described by Subsection (b) may not bring an action based on that conduct under this section." *Id.* § 261.110(*l*).

## 2. Discussion

On appeal, TYC contends that the conduct at issue may give rise to actions under both the Act and the family code. However, in its order denying TYC's plea to the jurisdiction, the trial court noted the following: "IT IS ORDERED that Plaintiff is precluded from submitting any jury issues under Chapter 261 of the Texas Family Code on any causes of action that could sustain an action under Chapter 554 of the Texas Government Code known as the Texas Whistleblower's [sic] Act . . . ." This mirrors the language provided in section 261.110(*l*) of the family code and protects TYC from concurrent liability under both chapter 261 of the family code and the Act. *See id.* Garza has presented jurisdictional evidence which demonstrates that she reported child abuse to her supervisor, a state regulatory agency, Child Protective Services, and a law enforcement agency, the

21

Edinburg Police Department. Garza has thus alleged and provided jurisdictional evidence demonstrating continuing retaliatory acts engaged in by TYC officials which created a "hostile work environment." This evidence may support a claim under chapter 261 of the family code, which, in turn, creates a fact issue regarding jurisdiction. *See id.* § 261.110(b). We conclude that whether the acts alleged by Garza fall solely under the Act or chapter 261 of the family code is for the fact finder to decide. *See Miranda*, 133 S.W.3d at 227-28 (requiring the trial court to deny a plea to the jurisdiction if the evidence creates a fact question as to jurisdiction and to leave the resolution of the fact question to the fact finder); *see also Shilling*, 266 S.W.3d at 101. As such, TYC has not established its plea to the jurisdiction as to Garza's chapter 261 claims as a matter of law. Accordingly, we overrule TYC's second issue.

## IV. CONCLUSION

Having overruled both of TYC's issues on appeal, we affirm the trial court's denial of TYC's plea to the jurisdiction.

_____
DORI CONTRERAS GARZA,
Justice

Memorandum Opinion delivered and
filed this the 7th day of May, 2009.

22